IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL RIVERA, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 21-1825-CFC |
| | : |
| THE NEMOURS FOUNDATION, | : |
| | : |
| Defendant. | : |

Daniel Rivera, Philadelphia, Pennsylvania, Pro Se Plaintiff.

Kathleen Furey McDonough and Jennifer Penberthy Buckley, Potter Anderson & Corroon, LLP, Wilmington, Delaware.   Counsel for Defendant.

**MEMORANDUM OPINION**

August 8, 2023
Wilmington, Delaware

**CONNOLLY, Chief Judge:**

In December 2021, Plaintiff Daniel Rivera filed this employment discrimination lawsuit, naming as the sole Defendant his former employer, the Nemours Foundation. (D.I. 2) Plaintiff appears *pro se* and was granted permission to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. (D.I. 4) Before the Court is Defendant's motion for summary judgment, which was filed in September 2022. (D.I. 20) Plaintiff has failed to file a response.

## I. BACKGROUND AND FACTS AS PRESENTED BY THE PARTIES

Plaintiff identifies as Hispanic and Puerto Rican. He was born in Philadelphia. His parents were born in Philadelphia and Camden.

Plaintiff was employed by Defendant in the Anesthesiology Department of the Nemour's Children's Hospital in Delaware from August 26, 2019, until his termination on June 8, 2020. Plaintiff was originally hired as an Anesthesia Technician.

Clinical Operations Director Tim Cox was Plaintiff's supervisor until Cox retired in March 2020. In preparation for Cox's retirement, some structural changes were made in the Department. On or around January 1, 2020, Leslie Jackson was elevated from her position as a Certified Registered Nurse (CRNA) to Lead CRNA. On January 8, 2020, Plaintiff was promoted to a newly created position—Lead Anesthesia Technician. Jackson, who already knew Plaintiff from

working with him in the Department, was one of several employees asked for input regarding offering the promotion to Plaintiff, and Jackson was "on board." (D.I. 24-2 at 2) In the new structure, Jackson supervised Plaintiff in his newly created position.

Jackson eventually expressed dissatisifaction with several aspects of Plaintiff's performance and communication, as evidenced by emails she sent to other supervisory personnel in the Department in May 2020. In a May 1, 2020 email to the Administrative Director of the Department, Jackson asked if Plaintiff had yet received a 90-day review for his new role, noting that she did not know when he officially took the position, that she "had some serious concerns,"[1] and that she could not at that time "endorse him being promoted to a supervisor/salaried role." (D.I. 25-1 at 10) Jackson was unclear when the review was due and whether Cox had completed it prior to his retirement. (D.I. 25 at 3) On May 28, 2020, Jackson met with Plaintiff to complete the review. On the assessment form, Jackson indicated that Plaintiff was underachieving both in performance results and behavior. (D.I. 24-2 at 29) Jackson recommended extending Plaintiff's evaluation period by an additional 90 days, implemented an action plan with expectations for continued employment, and recommended that a

---

[1] Jackson's stated concerns were performance-based and were conveyed in the May 1, 2020 email and other emails Jackson sent in May. Plaintiff disputes that Jackson's concerns were legitimate or accurate depictions of his performance.

2

consequence of failing to improve performance should be consideration of Plaintiff relinquishing the lead role.  (*Id.* at 29-30)

On June 5, 2020, during a procedure in an operating room, Jackson questioned Plaintiff about reportedly being late after being called in the day before (Plaintiff disputes that he had arrived late), and another aspect of his performance. Plaintiff felt that Jackson was berating and belittling him in front of colleagues. Sensing Plaintiff's growing hostility, Jackson asked him to meet in her office, where they continued the conversation.  It is undisputed that Plaintiff used the word "retarded" in Jackson's office.

In an email later that day, Jackson stated that Plaintiff "became agitated during a conversation around his performance – it escalated and he began using inappropriate language," and that "[h]e commented that 2 CRNAs on our team were 'retarded.'"  (D.I. 25-1 at 20)  By Plaintiff's account, he said "[r]egardless of what anybody says, whether it's Ruth or Marian, if they say something that's retarded or not you believe them." (D.I. 24-1 at 59)

Plaintiff asserts that after he used the word "retarded," Jackson became very upset, to the point of hyperventilating, and told him that she has a daughter with mental disabilities and finds the word very offensive.  Jackson then told Plaintiff to go back to where he came from and that she cannot work with someone like him, before terminating his employment.

3

Plaintiff was told on a subsequent conference call that the termination decision had been upheld by the leadership team. The date of the conference call is not provided in the record, but it appears to have taken place on or around June 8, 2020. Plaintiff provided a transcript of the conference call, which included Jackson, Department Chief Dr. Doyle Lim, Terri Hoopes, and Tracy Sola (D.I. 24-2 at 34-35), as well as a transcript of a follow-up call from Sola confirming Plaintiff's termination (*id.* at 38-40) Plaintiff explained during his deposition that he had surreptitiously recorded both calls on his cellphone, but that his grandmother had tried calling him twice during the conference call, causing the recording to stop each time, resulting in gaps in the transcript. (D.I. 24-1 at 66)

On the conference call, it was explained to Plaintiff that using the word "retarded" is "extremely offensive; inappropriate in any workplace context; particularly in a children's hospital; against what "we believe at Nemours"; and should be removed from his vocabulary. (D.I. 24-2 at 38-39) Plaintiff argued on the call that he used the term "informally" and that Jackson took offense and took it personally "because of her situation." (*Id.*) Plaintiff argued that his use of the word was not offensive because he did not use it to describe specific people. (*Id.* at 39)

During his deposition, Plaintiff further clarified the difference, to him, between how he used the word and how Jackson alleged that he had used it: "I said

4

they say something that's retarded. She stated that I called them specifically retarded." (D.I. 24-1 at 62) Plaintiff explained that, in this context, he used the word "retarded" to mean "foolish." (*Id.* at 59, 62)

Plaintiff further testified at his deposition that during the conference call, which included Jackson, he had told Dr. Lim and the rest of the group about Jackson's statement that he should go back to where he came from and that she could not work with someone like him. (D.I. 24-1 at 66) This exchange does not appear in the transcript of the conference call, but Plaintiff claimed in his deposition testimony that the exchange occurred during one of the gaps in the recording when his grandmother had tried calling him. (*Id.*) In Jackson's sworn declaration, executed one month after Plaintiff's deposition, she stated:

> I am aware that Plaintiff has alleged in this case that, on June 5, 2020, I told him "go back to where you come from" and "I can't work with someone like you." I do not recall making either statement. Nothing that I said to Plaintiff related to his race or national origin. I bear no discriminatory animus against Plaintiff based on his race or national origin.

(D.I. 25 at 5)

In an undated written letter to Plaintiff, Jackson confirmed that he was terminated, effective June 8, 2020, "for poor work performance and not demonstrating our standards of behavior." (D.I. 25-1 at 22) He was directed to return his cell phone and ID badge by June 22, 2020. (*Id.*)

5

Plaintiff exhausted his administrative remedies and then filed this lawsuit, claiming that Defendant discriminated against him on the basis of race and national origin in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"). Defendant moves for summary judgment, arguing that Plaintiff's claim fails because he cannot establish a prima facie case for discrimination in that there is no evidence to support an inference of discrimination based on race or national origin and, even if Plaintiff could make a prima facie case of discrimination, he cannot demonstrate that Defendant's decision to terminate his employment based on his conduct was a pretext for discrimination. (D.I. 20)

## II. LEGAL STANDARDS

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the burden of persuasion at trial would be on the non-moving party, then the moving party may satisfy its burden of production by pointing to an absence of evidence supporting the non-moving party's case, after which the burden of production shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

6

*Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989).

Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "[A] dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* (internal quotation marks omitted). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the moving party] do not establish the absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460-61.

The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). "[T]he facts asserted by the nonmoving party, if supported by affidavits or other evidentiary material, must be regarded as true . . . ." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir.

7

1996). If "there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment." *Id.* at 1081 (internal quotation marks omitted).

## III. DISCUSSION

Plaintiff bears the initial burden of establishing a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The Third Circuit has held that, to establish a prima facie case for employment discrimination, a plaintiff must show that "1) s/he is a member of a protected class, 2) s/he was qualified for the position s/he sought to attain or retain, 3) s/he suffered an adverse employment action, and 4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (quoting *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

Establishing an inference of intentional discrimination requires a plaintiff to show that the plaintiff was treated differently than similarly situated employees outside of the plaintiff's protected class who are otherwise alike for relevant criteria. *See, e.g., Young v. UPS*, 575 U.S. 206, 217-19 (2015) (comparing the alleged discrimination against a pregnant worker to other non-pregnant workers with respect to workplace responsibilities); *Furnco Constr. Corp. v. Waters*, 438

U.S. 567, 577 (1978) (stating that the inference of discrimination in a plaintiff's prima facie employment discrimination case arises when acts, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors" such as race).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to establish a legitimate, nondiscriminatory case for the adverse employment action. *See McDonnell Douglas Corp.*, 411 U.S. at 802. The defendant only needs to provide a legitimate reason for the discharge, which is generally understood as a "relatively light" burden. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The plaintiff can rebut this reason by showing that it is pretextual and not legitimate. *See In re Tribune Media Co.*, 902 F.3d 384, 392 (3d Cir. 2018).

The Third Circuit has enunciated two alternative methods by which a plaintiff can establish pretext sufficient to defeat summary judgment:

> First, the plaintiff can present evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication." Second, and alternatively, the plaintiff can provide evidence that "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action."

*Atkinson v. Lafayette College*, 460 F.3d 447, 354 (3d Cir. 2006) (quoting *Fuentes*, at 762). A Plaintiff can make such a showing by "demonstrat[ing] such

9

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (alteration original) (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).

Defendant concedes that Plaintiff is a member of a protected class, was qualified for the position he held, and that termination of his employment constituted an adverse employment action. (D.I. 22 at 5 n.1) Thus, the only issue before the Court is the fourth and final element of Plaintiff's claim, *i.e.*, whether the action occurred under circumstances that could give rise to an inference of intentional discrimination. More precisely, the issue is whether Defendant has established that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law based either on Plaintiff's failure to demonstrate such an inference, or Plaintiff's failure to rebut Defendant's proffered reason for his termination as pretextual and illegitimate.

Plaintiff has demonstrated a genuine issue of material fact that Jackson's alleged admonition that he should go back to where he came from could give rise to an inference that she was discriminating against him based on his Puerto Rican descent. Defendant has offered alternative, nondiscriminatory explanations for

10

what this statement could have meant, and Plaintiff reasonably conceded during his deposition that, in a different context, the statement could have an alternative meaning. The discriminatory implications and long pejorative history of telling someone of foreign lineage to go back to where they came from, however, are enough to stave off summary judgment on this issue.

The question then becomes whether there is no genuine issue of material fact that Defendant has offered an unrebutted, legitimate, non-discriminatory, reason for Plaintiff's termination. Defendant forcefully asserts that it has presented such a legitimate non-discriminatory reason for Plaintiff's termination—his undisputed use of the word "retarded" to mean "foolish," which his superiors deemed as unacceptable to describe his co-workers' sentiments. Normally, the Court would agree. Afterall, it is beyond controversy that a private employer can fire an employee for speech it deems offensive. But those are not all the facts.

In the context of this case, it is impossible to consider the potential pretextual nature of Defendant's justification for Plaintiff's termination without considering Jackson's alleged statement that Plaintiff, who identifies as Hispanic and Puerto Rican, should go back to where he came from. Notably, Jackson stopped well short of denying that she made this statement, swearing instead only that she could not recall making it. If Plaintiff's deposition testimony is credited (and on this record, it is unrebutted), he raised Jackson's comments approximately

11

three days after they were made, on a conference call that included Jackson.[2] Plaintiff's deposition was conducted a month before Jackson executed her declaration stating that she did not recall making the comment, yet she did not reconcile how Plaintiff's allegedly asserting in her presence that she made the comment, days after she allegedly made it, would not give her cause to admit or deny having done so.

Viewing the record in the light most favorable to Plaintiff, the Court must assume that Jackson made the alleged comment, Jackson intended it to carry the discriminatory meaning typically associated with it, and that Plaintiff conveyed the comment to the individuals on the conference call. In such a context, one in which Defendant fired Plaintiff for using inappropriate language but, on the current record, had no response—be it an inquiry, censure, termination, or something in between—to Jackson's alleged insidious comment directed at Plaintiff as a member of a constitutionally protected class, the Court concludes that Plaintiff has "demonstrate[ed] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

---

[2] As noted, the transcript of the conference call does not contain Plaintiff relaying Jackson's alleged comment, and Plaintiff testified that the exchange occurred during one of the gaps in the recording. The absence of the exchange from the transcript might affect a jury's assessment of Plaintiff's credibility, but that is a question within the province of the fact finder, not a legal question to be determined by the Court on summary judgment.

reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *See Tourtellotte*, 636 F. App'x at 842. Accordingly, there are triable issues present in this case and summary judgment would be inappropriate.

## IV. CONCLUSION

For the above reasons, the Court will deny Defendant's motion for summary judgment. (D.I. 20)

The Court will issue an Order consisted with this Memorandum Opinion.